# UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF PENNSYLVANIA

JEFFREY A. BELL,                    :
                                    :
      Plaintiff           :
                                    :        No. 3:12-CV-00634
   vs.                          :
                                    :        (Judge Nealon)
CAROLYN W. COLVIN, ACTING           :
COMMISSIONER OF SOCIAL              :
SECURITY,                           :
                                    :
      Defendant           :

FILED
SCRANTON

DEC 2 3 2013

PER _____
    DEPUTY CLERK

## MEMORANDUM

## Background

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Jeffrey A. Bell's claim for social security disability insurance benefits.

Bell protectively filed his application for disability insurance benefits on July 25, 2009. Tr. 51 and 141.[1] The application was initially denied by the Bureau of Disability Determination[2] on October 29, 2009. Tr. 53-57. On November 19, 2009, Bell requested a hearing before an administrative law judge. Tr. 58-59. After over eleven months had passed, a hearing was held on October 28, 2010, before an administrative law judge. Tr.

---

1. References to "Tr.__" are to pages of the administrative record filed by the Defendant as part of the Answer on June 4, 2012.

2. The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration. Tr. 54.

19-50. On November 24, 2010, the administrative law judge issued a decision denying Bell's application. Tr. 9-18. On February 3, 2011, Bell filed a request for review with the Appeals Council and after about 12 months the Appeals Council on February 1, 2012, concluded that there was no basis upon which to grant Bell's request for review. Tr. 1-5 and 122-124.

Bell then filed a complaint in this court on April 5, 2012. Supporting and opposing briefs were submitted and the appeal[3] became ripe for disposition on October 5, 2012, when Bell elected not to file a reply brief.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." It is undisputed that Bell meets the insured status requirements of the Social Security Act through December 31, 2013. Tr. 9, 11 and 214.

Bell, who was born in the United States on July 25, 1964, graduated from high school in June, 1983, and can read, write, speak and understand the English language and perform basic mathematical functions such as paying bills, counting change, handling a savings account and using a checkbook and money orders.

---

3. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D.Pa. Local Rule 83.40.1.

Tr. 23, 51, 125, 128, 175, 179, 185, 201 and 326. During his elementary and secondary schooling, Bell attended regular education classes. Tr. 185. After graduating from high school, Bell did not complete "any type of special job training, trade or vocational school" but did join the United States Marine Corps and served in that branch of the military from September 22, 1983 to September 1, 1987, when he was honorably discharged. Tr. 23, 138 and 326. Bell's position in the Marine Corps involved operating a personnel carrier and refueling operations. Tr. 23 and 190.

After being discharged from the military, Bell worked for a company that made stainless steel containers but after about a year was laid off because of lack of demand for the containers. Tr. 326. In January, 1990, Bell obtained a position as a corrections officer at Rockview State Correctional Institution located near Bellefonte, Pennsylvania, and worked in that capacity until October 20, 2003, when he went on sick leave.[4] Tr. 167. In February, 2004, he received a state disability retirement because of mental health issues. Tr. 167 and 181. Bell reported that he received sick and vacation leave pay from the Commonwealth of Pennsylvania in 2004 totaling $11,816.73 and started to receive disability retirement in February, 2004, for depression, anxiety and posttraumatic stress disorder. Tr. 167.

---

4. In 2003, Bell in addition to working as a corrections officer also had employment with Lowes Home Centers, Inc. ("Lowes"). Tr. 158. Bell's earnings from Lowes were $5334.16. Id.

After taking the state disability retirement, Bell from 2004 through 2008, had several relatively short-lived jobs, including with Shop-Vac Corporation, Lowes Home Centers, Inc., Topper Petroleum, Inc., Jacobs Masonry, and Capperella Brothers, Inc., and also obtained positions through temporary employment agencies. Tr. 159-160 and 167. The last position Bell held was as a warehouse person with Wolfe Furniture Enterprises, Inc., which commenced in 2008 and ended in April of 2009. Tr. 155, 165 and 171.

The records of the Social Security Administration reveal that Bell had earnings in the years 1981 through 2009. Tr. 154-155. Bell's annual earnings range from a low of $153.74 in 1989 to a high of $52,275.02 in 2003. Id. From 1993 through 2004, Bell's yearly earnings averaged $39,548.07, and from 2005 through 2009 his earnings averaged $9576.84. Id. Bell's total earnings during those 29 years were $646,651.48. Id.

Bell has past relevant employment as a prison guard which was described by a vocational expert as semi-skilled, light work and as a warehouse worker which was described as unskilled, heavy work.[5] Tr. 39.

---

5. The terms sedentary, light, medium and heavy work are defined in the regulations of the Social Security Administration as follows:

> (a) *Sedentary work*. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting
> (continued...)

Bell initially claimed that he became disabled on October 20, 2003, because of mental impairments. Tr. 138 and 180. The mental impairments alleged were anxiety, depression and posttraumatic stress disorder. Tr. 180. The posttraumatic stress

---

5. (...continued)
      or carrying articles like docket files, ledgers, and
      small tools. Although a sedentary job is defined as
      one which involves sitting, a certain amount of walking
      and standing is often necessary in carrying out job
      duties. Jobs are sedentary if walking and standing are
      required occasionally and other sedentary criteria are
      met.

      (b) *Light work.* Light work involves lifting no more
      than 20 pounds at a time with frequent lifting or
      carrying of objects weighing up to 10 pounds. Even
      though the weight lifted may be very little, a job is
      in this category when it requires a good deal of
      walking or standing, or when it involves sitting most
      of the time with some pushing and pulling of arm or leg
      controls. To be considered capable of performing a
      full or wide range of light work, you must have the
      ability to do substantially all of these activities.
      If someone can do light work, we determine that he or
      she can also do sedentary work, unless there are
      additional limiting factors such as loss of fine
      dexterity or inability to sit for long periods of time.

      (c) *Medium work.* Medium work involves lifting no more
      than 50 pounds at a time with frequent lifting or
      carrying of objects weighing up to 25 pounds. If
      someone can do medium work, we determine that he or she
      can do sedentary and light work.

      (d) *Heavy work.* Heavy work involves lifting no more
      than 100 pounds at a time with frequent lifting or
      carrying of objects weighing up to 50 pounds. If
      someone can do heavy work, we determine that he or she
      can also do medium, light, and sedentary work.

20 C.F.R. § 404.1567.

5

disorder purportedly was caused by Bell's extended work as a corrections officer in a maximum security housing unit where he observed suicides, attempted suicides, self mutilations, violent assaults and also was the victim of assaultive behavior by inmates, including having urine and feces thrown on him. Tr. 25-26, 180 and 324. At the administrative hearing Bell amended the alleged disability onset date to May 25, 2009, and also claimed that he was disabled as the result of chronic and frequent, uncontrolled diarrhea, requiring 12-15 bathroom visits per day.[6] Tr. 33, 36 and 267; Doc. 7, Plaintiff's Brief, p. 5. Bell alleged that the cause of the diarrhea was Celiac disease.[7] Tr. 46 and 48.

---

6. The vocational expert testified that such frequency would preclude an individual from engaging in competitive work. Tr. 45.

7. According to the website of the Mayo Clinic, celiac disease

>  is an immune reaction to eating gluten, a protein found in wheat, barley and rye.
>
>  If you have celiac disease, eating gluten triggers an immune response in your small intestine. Over time, this reaction produces inflammation that damages the small intestine's lining and prevents absorption of some nutrients (malabsorption).
>
>  The intestinal damage can cause weight loss, bloating and sometimes diarrhea. . . .
>
>  There is no cure for celiac disease – but following a strict gluten-free diet can help manage symptoms and promote intestinal healing.

Celiac disease, Definition, Mayo Clinic staff, http://www.mayo clinic.com/health/celiac-disease/DS00319 (last accessed December 11, 2013. There are several grades/stages of damage to the small intestines caused by celiac disease. In stage 1 microscopic

(continued...)

Bell's girlfriend corroborated Bell's testimony regarding the frequency of his bathroom visits. Tr. 49. She indicated that he had frequent episodes of diarrhea and visited the bathroom 10-14 times per day and that when he goes places he takes a change of clothes with him just in case he has an accident. Tr. 48-49.

For the reasons set forth below, the court will remand the case to the Commissioner for further proceedings.

**Standard of Review**

When considering a social security appeal, the court has plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d

---

7. (...continued)
examination of biopsed tissue of the intestines reveals lympocytosis in the intestinal lining (white blood cells infiltrate the surface of the intestinal lining). In stage 2 there are increased white blood cells infiltrating the intestinal lining and tube-like depressions in the intestinal lining called crypts are larger than normal. In stage 3, the changes of stage 2 are present as well as villi which line the intestinal wall and absorb nutrients atrophy (flatten and shrink in size). Celiac Disease & Gluten Sensitivity, Marsh Stage of Celiac Disease, About.com, http://celiacdisease.about.com/od/diagnosingcelia cdisease/ss/MarshScore.htm (Last accessed December 11, 2013). The medical records, particularly a pathology report, suggest that Bell suffered from stage 2 or 3 celiac disease. Tr. 350. The pathology report indicates that the lining of Bell's small intestine exhibited "villous blunting[ i.e. flattening or atrophy of the villi], intraepithelial lymphocytosis [white blood cells infiltrating the lining of the small intestine] along with hyperplastic crypts [larger than normal depressions in the lining of the small intestine]." Id.

857, 858 (3d Cir. 1995). However, the court's review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance.

Brown, 845 F.2d at 1213.   In an adequately developed factual
record substantial evidence may be "something less than the weight
of the evidence, and the possibility of drawing two inconsistent
conclusions from the evidence does not prevent an administrative
agency's finding from being supported by substantial evidence."
Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all
the other evidence in the record," Cotter, 642 F.2d at 706, and
"must take into account whatever in the record fairly detracts
from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S.
474, 488 (1971).   A single piece of evidence is not substantial
evidence if the Commissioner ignores countervailing evidence or
fails to resolve a conflict created by the evidence.   Mason, 994
F.2d at 1064.   The Commissioner must indicate which evidence was
accepted, which evidence was rejected, and the reasons for
rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642
F.2d at 706-707.   Therefore, a court reviewing the decision of the
Commissioner must scrutinize the record as a whole.   Smith v.
Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v.
Califano, 606 F.2d 403, 407 (3d Cir. 1979).

Another critical requirement is that the Commissioner
adequately develop the record. Shaw v. Chater, 221 F.3d 126, 131
(2d Cir. 2000)("The ALJ has an obligation to develop the record in
light of the non-adversarial nature of benefits proceedings,
regardless of whether the claimant is represented by counsel.");

Rutherford v. Barnhart, 399 F.3d 546, 557 (3d Cir. 2005); Fraction
v. Bowen, 787 F.2d 451, 454 (8th Cir. 1986); Reed v. Massanari,
270 F.3d 838, 841 (9th Cir. 2001); Smith v. Apfel, 231 F.3d 433.
437 (7th Cir. 2000); see also Sims v. Apfel, 530 U.S. 103, 120
S.Ct. 2080, 2085 (2000)("It is the ALJ's duty to investigate the
facts and develop the arguments both for and against granting
benefits[.]").  If the record is not adequately developed, remand
for further proceedings is appropriate.  Id.

**Sequential Evaluation Process**

To receive disability benefits, the plaintiff must
demonstrate an "inability to engage in any substantial gainful
activity by reason of any medically determinable physical or
mental impairment which can be expected to result in death or
which has lasted or can be expected to last for a continuous
period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).
Furthermore,

> [a]n individual shall be determined to be under a
> disability only if his physical or mental impairment or
> impairments are of such severity that he is not only
> unable to do his previous work but cannot, considering
> his age, education, and work experience, engage in any
> other kind of substantial gainful work which exists in
> the national economy, regardless of whether such work
> exists in the immediate area in which he lives, or
> whether a specific job vacancy exists for him, or
> whether he would be hired if he applied for work.  For
> purposes of the preceding sentence (with respect to any
> individual), "work which exists in the national economy"
> means work which exists in significant numbers either in
> the region where such individual lives or in several
> regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance and supplemental security income claims. See 20 C.F.R. §404.1520; Poulos, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[8] (2) has an impairment that is severe or a combination of impairments that is severe,[9] (3) has an impairment or combination of impairments that meets or equals the requirements

---

[8]. If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further. Substantial gainful activity is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit." 20 C.F.R. § 404.1510.

[9]. The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 404.1520(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id. If a claimant has any severe impairments, the evaluation process continues. 20 C.F.R. § 404.1520(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process. 20 C.F.R. §§ 404.1523 and 404.1545(a)(2). An impairment significantly limits a claimant's physical or mental abilities when its effect on the claimant to perform basic work activities is more than slight or minimal. Basic work activities include the ability to walk, stand, sit, lift, carry, push, pull, reach, climb, crawl, and handle. 20 C.F.R. § 404.1545(b). An individual's basic mental or non-exertional abilities include the ability to understand, carry out and remember simple instructions, and respond appropriately to supervision, coworkers and work pressures. 20 C.F.R. § 1545(c).

of a listed impairment,[10] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[11]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id; 20 C.F.R. § 404.1545; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

**Medical Records**

---

10. If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step.

11. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

Before the court addresses the administrative law judge's decision and the arguments of counsel, some of Bell's medical records will be reviewed. The court will primarily focus on medical records of treatment received by Bell after the amended alleged disability onset date of May 25, 2009.

From April 30, 2009, through September 10, 2009, Bell was examined and treated by medical providers at Centre Medical and Surgical Associates, P.C., located in State College, Pennsylvania, including Jeffrey W. Pro, M.D., and Rick D. Pasquariello, M.D., for an intestinal bacterial infection, Clostridium Difficile, which was causing Bell to have frequent episodes of diarrhea. Tr. 264-265, 269, 280-283, 286- 288, 291, 294 and 295. The medical records reveal that this bacterial infection was treated with antibiotics. Id. Bell's stool samples tested in the laboratory on May 12 and June 15, 2009, were positive for the C. Difficile bacteria and negative on June 25, August 24 and September 1, 2009. Tr. 286. Also, on August 27, 2009, Bell had blood work relating to celiac disease performed at Geisinger Medical Center in Danville, Pennsylvania. Tr. 290. The blood work revealed that Bell was positive for the Celiac Antibody Panel.[12] Id. On September 10, 2009, Dr. Pasquariello concluded

_____

12. In fact the test results were considered high. The primary test to identify the disease, TTG IG AB, is considered positive
(continued...)

that Bell's bacteria infection and diarrhea had resolved but continued to treat him prophylactically with antibiotics. Tr. 294. At the appointment on September 10th with Dr. Pasquariello, Bell reported that he was having bowel movements about twice daily. Id. However, on February 2, 2010, Bell had an appointment with Genci P. Babameto, M.D., a specialist in gastroenterology, at Geisinger Medical Center in Danville. Tr. 373-374. At that appointment, Bell complained of frequent diarrhea, approximately 9 times per day. Id. After performing a clinical interview and physical examination, Dr. Babameto's assessment was that Bell suffered from chronic diarrhea, positive celiac disease and a history of Clostridium Difficile infection. Tr. 374. Dr. Babameto scheduled Bell for an upper endoscopy involving small bowel biopsies. Id. That endoscopy was performed on February 23, 2010, as noted earlier in footnote 7, and revealed evidence of celiac disease. Tr. 350-351 and 359-360.

---

12. (...continued)
according to the reference range on the laboratory report if the antibody is present at a level of greater than 8 U/mL. Bell's level was greater than 100 U/mL. Tr. 290; see Interpretive Handbook, Tissue Transglutaminase (tTG) Antibodies, IgA and IgG Profile, Serum, Mayo Clinic, Mayo Medical Laboratories, http://www.mayomedicallaboratories.com/interpretive-guide/index.h tml?alpha=T&unit_code=83671 (Last accessed December 12, 2013). The reference range in the Mayo Medical Laboratories Interpretive Handbook is greater than 9 U/mL. Id.

Bell was treated for mental health conditions from June 11, 2009, through October 1, 2010, by Edwin C. Finch, Ph.D., a licensed psychologist, located in Williamsport, Pennsylvania, and by Punyabrata Roy, M.D., a psychiatrist, at Universal Community Behavioral Health, located in Lock Haven, Pennsylvania. Tr. 258-257, 324-329, 338, 383-391, 393-404, 405-406, 412-413, 416-426 and 430-432. The record reveals that during the period June 11, 2009 through October 1, 2008, Dr. Finch had at least 28 encounters with Bell. Id. During the same time frame, Dr. Roy had 5 encounters with Bell. Id.

The appointments with Dr. Roy occurred on July 15, 2009, and January 8, April 2, July 2, and October 1, 2010. Tr. 257-258, 338 and 430-432. At the appointment on July 15, 2009, Dr. Roy's assessment was that Bell suffered from major depressive disorder, posttraumatic stress disorder, and chronic generalized anxiety disorder and he gave Bell a Global Assessment of Functioning (GAF) score of 60.[13] Tr. 258. At the appointments on January 8 and

---

13. The GAF score allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. *Diagnostic and Statistical Manual of Mental Disorders* 3-32 (4th ed. 1994). A GAF score is set within a particular range if either the symptom severity or the level of functioning falls within that range. Id. The score is useful in planning treatment and predicting outcomes. Id. The GAF rating is the single value that best reflects the individual's overall functioning at the time of examination. The rating, however, has two components:

(continued...)

April 2, 2010, Dr. Roy found that Bell in addition to depression,
anxiety and posttraumatic stress also suffered from bipolar
disorder, not otherwise specified, and gave Bell a GAF score of
60. Tr. 338 and 430. At the appointment on July 2, 2010, Dr. Roy
also noted alcohol dependence as a condition Bell suffered from
and gave him a GAF score of 60. Tr. 431. Finally, on October 1,
2010, Dr. Roy's assessment was basically the same other than
equivocating on the bipolar disorder diagnosis by stating that he
could not rule out bipolar disorder. Id.

On September 14, 2009, Dr. Finch completed an assessment
of Bell's work-related mental functional abilities. Tr. 301-302.

---

13. (...continued)
(1) symptom severity and (2) social and occupational functioning.
The GAF is within a particular range if either the symptom
severity or the social and occupational level of functioning
falls within that range. When the individual's symptom severity
and functioning level are discordant, the GAF rating reflects the
worse of the two. Thus, a suicidal patient who is gainfully
employed would have a GAF rating below 20. A GAF score of 21-30
represents behavior considerably influenced by delusions or
hallucinations or serious impairment in communication or judgment
or inability to function in almost all areas. A GAF score of 31-
40 represents some impairment in reality testing or communication
or major impairment in several areas, such as work or school,
family relations, judgment, thinking or mood. Id. A GAF score of
41-50 indicates serious symptoms or any serious impairment in
social, occupational or school functioning. Id. A GAF score of
51 to 60 represents moderate symptoms or any moderate difficulty
in social, occupational, or school functioning. Id. A GAF score
of 61 to 70 represents some mild symptoms or some difficulty in
social, occupational, or school functioning, but generally
functioning pretty well with some meaningful interpersonal
relationships. Id.

At that time Dr. Finch found that Bell had no marked or extreme mental limitations but was moderately limited in his ability to carry out detailed instructions and respond appropriately to work pressures in a usual work setting. Id. This functional assessment did note that Bell "is extremely anxious and has problems with attention [and] focus across all tasks even routine or enjoyable activities." Tr. 301. Dr. Finch further noted that Bell "has become more withdrawn socially," he forgets about and has missed appointments, he has a history of alcohol abuse but has been "sober almost 2 years now" and that the history of alcohol abuse "may have contributed to the degree of memory and attentional problems he demonstrates." Tr. 301-302.

On October 21, 2009, Dr. Finch performed a formal psychological evaluation of Bell. Tr. 324-329. After performing a clinical interview and mental status examination, Dr. Finch's assessment was that Bell suffered from posttraumatic stress disorder, generalized anxiety disorder, panic disorder with agoraphobia,[14] alcohol dependence in remission, and major

---

14. According to the National Institutes of Health's website

    Panic disorder with agoraphobia is an anxiety disorder in which a person has attacks of intense fear and anxiety. There is also a fear of being in places where it is hard to escape, or where help might not be available.

    Agoraphobia usually involves fear of crowds, bridges, or
    (continued...)

depression. Tr. 328. Dr. Finch gave Bell a current GAF score of 66 with a highest score in the last year of 66 but further noted that Bell "can function, but only in a cursory, highly marginal manner." Id.

On October 26, 2009, Dr. Finch completed a second assessment of Bell's work-related mental functional abilities. Tr. 321-322. At that time Dr. Finch found that Bell was markedly limited in his ability to carry out detailed instructions,

---

14. (...continued)
being outside alone. . . .

Panic attacks involve short periods of intense symptoms, which peak within 10 minutes. Panic attack symptoms can include:

• Chest pain or discomfort
• Choking
• Dizziness or faintness
• Fear of being out of control

*    *    *    *    *    *    *    *    *

• Numbness or tingling
• Racing Heart
• Shortness of breath
• Sweating
• Trembling

With agoraphobia, you avoid places or situations because you do not feel safe in public places. The fear is worse when the place is crowded.

Panic Disorder with agoraphobia, MedlinePlus, U.S. National Library of Medicine, National Institutes of Health, http://www.nlm.nih.gov/medlineplus/ency/article/000923.htm (Last accessed December 13, 2013).

interact appropriately with the public and respond appropriately to changes in a routine work setting and that he was moderately limited in his ability to understand and remember detailed instructions, make judgments on simple work-related decisions, interact appropriately with supervisors and respond appropriately to work pressures in a usual work setting. Tr. 321. Dr. Finch noted that Bell has "[e]xtreme anxiety, poor focus, inability to recall [and] retrieve instructions as to how to get to appointment[s][] [and] loss of focus in routine conversation." Id. Dr. Finch further noted that Bell had a problem with "sustained attention;" that "complex task [were] extremely fatiguing, demanding;" Bell was "now sober but drank since 18;" Bell "toward the end of [his employment as a prison guard] when experiencing acute [posttraumatic stress disorder] and panic symptoms [] drank up to 15-20 beers per day;" and Bell has "subtle indicators of mild alcoholic dementia and/or Korsakoff syndrome[15] despite sobriety." Tr. 322.

---

15. Korsakoff syndrome is "a syndrome of anterograde and retrograde amnesia with confabulation associated with alcoholic or nonalcoholic polyneuritis described as 'cerebropathia psychica toxemia' by Korsakoff; currently used synonymously with the term amnestic syndrome or, more narrowly, to refer to the amnestic component of the Wernicke-Korsakoff syndrome, i.e., an amnestic syndrome resulting from thiamine deficiency." Dorland's Illustrated Medical Dictionary, 1836 (32nd Ed. 2012).

On October 29, 2009, based on a review of Bell's medical records, Arlene Rattan, Ph.D., a psychologist, completed an assessment of Bell on behalf of the Bureau of Disability Determination. Tr. 304-320. Dr. Rattan found that Bell suffered from posttraumatic stress disorder, generalized anxiety disorder, panic disorder with agoraphobia, alcohol dependence in remission and major depressive disorder. Tr. 306. Dr. Rattan found that Bell had moderate limitations in eleven areas of work-related mental functioning, including the ability to maintain attention and concentration for extended periods, the ability to get along with coworkers or peers, and the ability to respond appropriately to changes in the work setting. Tr. 304-305. Dr. Rattan stated that Bell was "able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from his impairments." Tr. 306.

On March 10, 2010, Dr. Finch completed on behalf of Bell a document entitled "Affective Disorder Questionnaire" in which Dr. Bell was asked to check any items which apply to Bell on the basis of records, interviews and/or tests. Tr. 409. Dr. Finch checked that Bell had anhedonia or pervasive loss of interest in almost all activities; sleep disturbance to excess; psychomotor retardation; decreased energy; feelings of worthlessness; difficulty concentrating or thinking; thoughts of suicide; extreme

restrictions of activities of daily living; marked difficulties in maintaining social functioning; extreme difficulties in maintaining concentration, persistence or pace; a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support; and a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate. Id.

On March 17, 2010, Dr. Finch prepared on behalf of Bell a document entitled "Case Summary." Tr. 412-413. In that document Dr. Finch noted that Bell was on several psychotropic medications, including Depakote, Trazodone and Celexa and that "[h]e frankly needs [those] medications to function even in the most marginal of ways" and "[h]e remains a [posttraumatic stress disorder] patient, and now there is an emerging agoraphobia and generalized anxiety disorder. It is all Mr. Bell can do to meet the most basic of life requirements, i.e., going to appointments, paying bills, coping with his paramour, etc. . . . As of Fall 2009 to the present, I cannot imagine Mr. Bell working at any job, no matter how supportive. For the last few months, he has begun to describe

(and signs and symptoms confirm) cognitive impairment." Id. Dr.
Finch gave Bell a current GAF score of 49, representing serious
symptoms. Id. Also, on September 30, 2010, Dr. Finch completed a
"Case Summary" in which he noted that Bell's depression had
worsened and that his cognitive function remains poor although
stable. Tr. 416-417. Dr. Finch gave Bell a current GAF score of
44. Tr. 417.

**Discussion**

The administrative record in this case is 436 pages in
length consisting, inter alia, of vocational and medical records.
The court has thoroughly reviewed that record. Bell argues that
the administrative law judge erred (1) by failing to appropriately
consider Dr. Finch's treatment records and opinion and (2) by
failing to appropriately consider Bell's chronic diarrhea and
celiac disease as a condition which limited his work-related
functional abilities. Those arguments have substantial merit.
The court will address Bell's argument in conjunction with
reviewing the administrative law judge's decision.

The administrative law judge at step one of the
sequential evaluation process found that Bell had not engaged in
substantial gainful work activity since May 25, 2009, the alleged
amended disability onset date. Tr. 11.

Step two is the first point where the administrative law judge erred. At step two, the administrative law judge found that Bell suffers from the following severe impairments: "posttraumatic stress disorder, major depressive disorder, generalized anxiety disorder and alcohol dependence[.]" Id. The administrative law judge further found that Bell alleged hypertension and mitral valve prolapse but that those conditions were non-severe impairments. Tr. 12. The administrative judge did not make a determination as to whether or not Bell's diarrhea and celiac disease were medically determinable severe or non-severe impairments and in fact erroneously indicated that laboratory studies merely indicated that Bell may have celiac disease and that "the medical records do not reflect any further testing or treatment." Tr. 11. There is no indication that the ALJ considered the opinion of Dr. Babameto who found that Bell suffered from chronic diarrhea, celiac disease and a history of C. Difficile infection, or the pathology report which indicated that Bell suffered from celiac disease.

The administrative law judge also did not make a determination as to whether or not Bell suffered from panic disorder with agoraphobia as found by Dr. Finch and by Dr. Rattan.

The Social Security regulations contemplate the administrative law judge considering whether there are any

medically determinable impairments and then when setting a
claimant's residual functional capacity considering the symptoms
of both medically determinable severe and non-severe impairments.
20 C.F.R. § 404.1529.  The determination of whether a claimant has
any severe impairments, at step two of the sequential evaluation
process, is a threshold test. 20 C.F.R. § 404.1520(c). If a
claimant has no impairment or combination of impairments which
significantly limit the claimant's physical or mental abilities to
perform basic work activities, the claimant is "not disabled" and
the evaluation process ends at step two. Id.  If a claimant has
any severe impairments, the evaluation process continues.   20
C.F.R. § 404.1520(d)-(g).  A failure to find a medical condition
severe at step two will not render a decision defective if some
other medical condition was found severe at step two.   However,
all of the medically determinable impairments both severe and non-
severe must be considered at step two and then at step four when
setting the residual functional capacity.   The social security
regulations mandate such consideration and this court has
repeatedly so indicated. See, e.g., Christenson v. Astrue, Civil
No. 10-1192, slip op. at 12 (M.D. Pa. May 18, 2011)(Muir, J.);
Little v. Astrue, Civil No. 10-1626, slip op. at 19-21 (M.D. Pa.
September 14, 2011)(Kosik, J.); Crayton v. Astrue, Civil No. 10-

1265, slip op. at 32-35 (M.D. Pa. September 27, 2011)(Caputo, J.);
20 C.F.R. §§ 404.1523 and 404.1545(a)(2).

The failure of the administrative law judge to find the above referenced conditions as medically determinable impairments, or to give an adequate explanation for discounting them, makes the ALJ's decisions at steps two and four of the sequential evaluation process defective. The error at step two is a sufficient basis to remand this case to the Commissioner for further proceedings because it calls into question the ALJ's assessment of Bell's residual functional capacity as will be explained in more detail below.

At step three of the sequential evaluation process, the administrative law judge found that Bell's impairments did not individually or in combination meet or equal a listed impairment. Tr. 12-13.

In addressing step four of the sequential evaluation process in his decision, the administrative law judge found that Bell could not perform his past relevant work as a prison guard and warehouse worker but that Bell had the residual functional capacity to perform the full range of work at all exertional levels but with certain nonexertional limitations. Tr. 13 and 16. Specifically, the ALJ found that Bell "due to his mental impairments, he would have the ability to understand, remember and

carry out simple one and two step instructions and can make simple decisions. He would be limited in his ability to understand and carry out detailed instructions. He would be able to stand an ordinary routine without supervision. He is able to meet the mental demands of work on a sustained basis, despite the limitations of his impairments." Tr. 13. In setting the residual functional capacity the ALJ did not provide for any functional limitations relating to Bell's chronic diarrhea or celiac disease and did not address the testimony of Bell's girlfriend which corroborated Bell's testimony about his need to use the bathroom frequently.

At step five, the administrative law judge, based on the above residual functional capacity and the testimony of a vocational expert, found that Bell had the ability to perform his previous job as a warehouse worker,[16] as well as unskilled, light work as a hand packager, custodial worker and laundry/dry cleaner worker, and that there were a significant number of such jobs in the regional and national economies. Tr. 17.

In setting the residual functional capacity at step 4 of the sequential evaluation process, the ALJ rejected the opinion of Dr. Finch. In doing so, the ALJ did not point to any contrary

_____

16. This finding is inconsistent with the ALJ's finding at step 4 that Bell could not "perform any past relevant work." Tr. 16.

medical opinion other than the state agency psychologist, Dr. Rattan, who merely reviewed Bell's medical records up to October 29, 2009. After that date, Dr. Finch had at least 18 encounters with Bell and completed case summaries indicating that Bell's condition worsened.

The preference for the treating physician's opinion has been recognized by the Court of Appeals for the Third Circuit and by all of the federal circuits. See, e.g., Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000). When the treating physician's opinion conflicts with a non-treating, non-examining physician's opinion, the administrative law judge may choose whom to credit in his or her analysis, but "cannot reject evidence for no reason or for the wrong reason." Id. In choosing to reject the evaluation of a treating physician, an administrative law judge may not make speculative inferences from medical reports and may reject treating physician's opinions outright only on the basis of contradictory medical evidence. Id. An administrative law judge may not reject a written medical opinion of a treating physician or psychologist based on his or her own credibility judgments, speculation or lay opinion. Id. An administrative law judge may not disregard the medical opinion of a treating physician based solely on his or her own "amorphous impressions, gleaned from the record and from his evaluation of the [claimant]'s credibility."

Id. As one court has stated, "Judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor" because "lay intuitions about medical phenomena are often wrong." Schmidt v. Sullivan, 914 F.2d 117, 118 (7th Cir 1990).

In this case, in rejecting the opinions of Dr. Finch, a treating psychologist who had numerous encounters with Bell, the ALJ did not give an adequate explanation for doing so or point to and explicitly rely on any medical evidence which contradicted Dr. Finch's opinion that Bell's condition worsened after October 29, 2010, when Dr. Rattan issued her opinion.

The error at step two of the sequential evaluation process, i.e., failing to address all medically determinable impairments, is another reason to find the ALJ's RFC assessment lacking. That error draws into question the administrative law judge's assessment of the credibility of Bell. The administrative law judge found that Bell's medically determinable impairments could reasonably cause Bell's alleged symptoms but that Bell's statements concerning the intensity, persistence and limiting effects of those symptoms were not credible. This determination by the administrative law judge was based on an incomplete and faulty analysis of all of Bell's medically determinable impairments.

Review of the administrative record reveals that the decision of the Commissioner is not supported by substantial evidence.   Therefore, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner will be vacated and the case will be remanded to the Commissioner for further proceedings.

An appropriate order will be entered.


_____
**United States District Judge**


Date: December 23, 2013